IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 1:15-cv-01940-MA |
| Plaintiff, | **AMENDED OPINION AND ORDER** |
| v. | |
| $22,600.00 U.S. Currency, *in rem*, | |
| Defendant. | |

MARSH, Judge

Plaintiff, the United States of America, brings this civil forfeiture proceeding pursuant to 21 U.S.C. § 881; 28 U.S.C. §§ 1345, 1355, 1356, and 1395; and 19 U.S.C. § 1610. Currently before the Court is Claimant Andrew Harrison's Motion to Suppress (ECF No. 10). For the reasons set forth below, this Court denies the Motion.

## BACKGROUND

On October 14, 2015, the Government filed its Complaint, alleging that the Defendant *in rem*, $22,600.00 in U.S. Currency, "represents proceeds traceable to an exchange for controlled substances or was used or intended to be used to facilitate such a transaction in violation of 21 U.S.C. § 801, *et seq.*" Compl. at 2. Attached to the Complaint is a Declaration by United States

1 - **AMENDED OPINION AND ORDER**

Postal Inspector Brendan Soennecken describing his training, investigation experience and the circumstances surrounding the seizure of the Defendant, *in rem*:

> 4. I know from my training and experience that illegal drug recipients often use USPS Priority Mail Express and Priority Mail services to ship the cash proceeds of the illegal sale of controlled substances . . . . I know from training and discussions with other law enforcement officers that these . . . proceeds of the illegal sale of controlled substances are often found during parcel investigations and interdictions.
>
> . . . .
>
> 6. Drug traffickers use USPS Priority Mail Express and Priority Mail services because of the reliability of delivery, speed of delivery, low cost, the customer's ability to track the package's shipment online, as well as the low risk of law enforcement. . . .
>
> 7. I know from my training and experience that USPS Priority Mail Express service is used primarily for business-related mailings. . . .
>
> . . . .
>
> 10. I know from my training and experience that controlled substances, especially marijuana, are mailed from Oregon to other states and that cash payments are mailed in return. I know from my training and experience that marijuana sales are substantially more profitable outside the state of Oregon than they are inside the state of Oregon.
>
> . . . .
>
> 11. On April 24, 2015, I went to the Medford Mail Processing Center . . . as part of my regular investigatory duties. While at the Mail Processing Center, I reviewed express mail parcels that were inbound to Southern Oregon from Portland. While reviewing parcels, I noted U.S. Mail priority express parcel, number E1836835701US. The parcel was addressed to "Andrew Harrison Exposure SMI . . . with a return address of "Barry Abrams 1078 Kingsley Road, Rydal, PA 19046" . . . . I noted the parcel as having been mailed on April 23, 2015, from zip code 19006 which corresponds with Huntingdon Valley, Pennsylvania. The parcel was scheduled for delivery on April 25, 2015 . . . . The waiver of signature upon delivery was clearly marked and signed by the mailer of the parcel. Additionally, the parcel had been written on with large letters which read "Hold for Pick-up."
>
> 12. Medford Police Officer Rob Havice, a Certified Controlled Substance Dog Handler, and his certified controlled substance detective dog Narc were at the Mail Processing Center with me on April 24, 2015. Officer Havice provided me with

a copy of a document outlining his qualifications and Narc's qualifications.... U.S. priority express parcel number E1836835701US was placed in a deployment line with five other similar control parcels for examination by Narc.... Officer Havice told me Narc alerted on the parcel ... in the manner that he has been trained to alert when he detects the odor of a controlled substance....

13. On April 24, 2015, I reviewed law-enforcement database information related to the sender and recipient of U.S. priority express parcel number E1836835701US. I learned both Andrew Harrison and Barry Abrams had given their correct addresses on the package. I also called a phone number I located for Andrew Harrison's business, Exposure SMI . . . . When I called the number it went to voicemail ... which gave as its greeting the option to leave a message for either "Exposure SMI" or "420 Farms," 420 being a term used within the marijuana subculture.

14. On April 25, 2015, Medford Police Officer Rob Havice and I spoke with Andrew Harrison at his residence . . . . As I approached the locked gate of Mr. Harrison's property, I viewed the neighboring farm with Officer Havice. We could see extremely large (+8 feet) marijuana plants growing in one of two large green houses on the neighbor's property....

15. At 9:32 a.m. on April 25, 2015, I called the number for Mr. Harrison given on the parcel.... Mr. Harrison answered and I told him I needed to speak to him about his parcel. He came to the gate for his driveway and spoke with Officer Havice and me. I introduced myself as a law enforcement officer and asked Mr. Harrison if he was expecting a parcel. He told me he was expecting a phone charger in the mail. I told Mr. Harrison I had a parcel for him and SMI Exposure, but I had some concerns about his parcel. I asked if his property was also called 420 Farms. He told me it was, but he also has a coconut water business which is part of Exposure SMI.

16. I told Mr. Harrison the parcel was from Pennsylvania and I believed it might be related to his business 420 Farms. He told me it had nothing to do with drugs and was related to his business SMI Exposure. I asked him what was in it and he told me it was probably about $20,000.00 and was probably for his import business. I asked Mr. Harrison what the money was for and he explained it was investment money and that he has a coconut water deal and needs money to pay for a container of coconut water/milk and he has to pay half down in order to buy the container of coconut water/milk.

17. I asked Mr. Harrison for consent to open the parcel. Andrew Harrison gave me consent to open the parcel and I did. Inside I found part of a cardboard box wrapped around a shoe box. Inside the shoe box were some receipts, a plastic bag, and a paper bag which had in it four individually-marked stacks of U.S. currency and

a letter-size marked envelope of U.S. currency. The five groupings were marked as $5,000, $5,000, $5,000, $5,600 and $2000, totaling $22,600.

> 18. I asked Mr. Harrison who the money was from and he told me his family wanted to invest in his coconut water business. I told him the parcel came from a Barry Abrams. Mr. Harrison told me Barry was a friend of the family. Mr. Harrison explained Barry Abrams is involved with a group of doctors in Pennsylvania who want to invest. I asked why Mr. Abrams did not send a check and Mr. Harrison told me when he asked Mr. Abrams for help Abrams told him he could send cash.

> 19. Officer Havice asked Mr. Harrison about his marijuana growing operation. Mr. Harrison told him he grows for several people, but was not growing at the moment and only had enough marijuana for himself. Officer Havice and I could observe a large greenhouse on Harrison's property, a greenhouse which appeared to have a heating and ventilation unit attached to it. Officer Havice asked Mr. Harrison about the greenhouse and Mr. Harrison explained he had recently purchased the greenhouse and it was newly built. He added nothing was growing in it yet. I told Mr. Harrison I believed the money in the parcel was from the illegal sale of marijuana by mail. Mr. Harrision told me it was not for the sale of marijuana and he did not sell marijuana illegally, Harrison added it was not for an investment in marijuana growing operations either. Officer Havice asked Mr. Harrison how many people he was growing marijuana for. Mr. Harrison told us he was growing for 10 Oregon Medical Marijuana Program (O.M.M.P.) patients, and was soon to be growing for 18 patients.

*Id.*, Ex. A (Decl. of Brendan Soennecken) at 4-8.

In his subsequent deposition, Soennecken testified that the express package had a guaranteed delivery time of 3:00 p.m. on April 25, 2015, but was marked "Hold for Pickup" which was unusual. Decl. of Amy E. Potter (ECF No. 13), Ex. B at 37-38, 49-51; *see also* Ex. A (Dep. of Officer Robert Havice) at 43, 58. Soennecken testified that he placed the package in a deployment line for the reasons set forth in his answer to Claimant's Interrogatory Number 2, which provides as follows:

> I noted the parcel was Priority Express Mail sent using an expedited service sealed from inspection. I noted the parcel was coming from Pennsylvania to Oregon. I noted the parcel was large, heavy and expensive to mail for Priority Express. I noted the signature requirement was waived which indicates the recipient couldn't or wouldn't personally be guaranteed to receive the parcel. I noted a twice handwritten message on the parcel requesting the parcel held for pick-up, which is unusual, and which I do not recall ever seeing before.

4 - **AMENDED OPINION AND ORDER**

Claimant's Memo. in Supp. at 14-15; *see also* Decl. of Amy E. Potter (ECF No. 13), Ex. B at 37-39.

Claimant moves the Court to suppress "all evidence related to and contained in the package carrying the defendant currency," because (1) the seizure of the package was without probable cause under the reasoning in *State v. Barnthouse*, 350 P.3d 536, 550-53 (Or. App. 2015), *aff'd*, 380 P.3d 952 (Or. 2016); (2) the dog sniff is of no consequence to the probable cause determination "because there is no particularity;" (3) the seizure of the contents of the package was without probable cause; and (4) due to spoliation of the evidence "there is not a basis to have probable cause to seize any or all of the currency." Claimant's Mot. to Suppress at 1-2.

## DISCUSSION

### I. Standards

Because civil forfeiture proceedings are quasi-criminal in nature, the exclusionary rule applies, barring the admission of evidence obtained in violation of the Fourth Amendment. *United States v. $493,850.00 in U.S. Currency*, 518 F.3d 1159, 1165 (9th Cir. 2008); *United States v. One 1977 Mercedes Benz, 450 SEL, VIN 11603302064538*, 708 F.2d 444, 448 (9th Cir. 1983); *see also* Rule G(8)(a) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions. Federal law governs the determination of whether a claimant's Fourth Amendment rights were violated. *One 1977 Mercedes Benz*, 708 F.2d at 448. Claimant, as the proponent of the Motion to Suppress, has the burden to prove that the evidence was seized in violation of the Fourth Amendment. *Id.*

An addressee on a mailed package has a possessory interest in its timely delivery, and a privacy interest in its contents. *United States v. Jefferson*, 566 F.3d 928, 933 (9th Cir. 2009); *United States v. Hoang*, 486 F.3d 1156, 1159-60 (9th Cir. 2007); *United States v. Hernandez*, 313 F.3d 1206, 1209 (9th Cir. 2002). However, "a package addressee does not have a Fourth Amendment

possessory interest in a package that has a guaranteed delivery time *until* the guaranteed delivery time has passed." *Jefferson*, 566 F.3d at 935 (emphasis added). Hence, the "temporary diversion of a package that does not affect its regularly scheduled delivery does not violate the Fourth Amendment." *Hoang*, 566 F.3d at 1158, 1162; *Jefferson*, 566 F.3d at 933-35. Because federal law is controlling (*see One 1977 Mercedes Benz*, 708 F.2d at 448), this Court declines to adopt the Oregon Court of Appeals reasoning in *State v. Barnthouse*, 350 P.3d 536 (Or. App. 2015), *aff'd*, 380 P.3d 952 (Or. 2016), holding that the temporary removal of a package from the mail stream constitutes a seizure under the Oregon Constitution.

"The determination of probable cause is based on the aggregate of facts, including circumstantial facts." *United States v. Currency, U.S. $42,500.00*, 283 F.3d 977, 980 (9th Cir. 2002); *see United States v. $17,980,00 in U.S. Currency*, No. 14-36052, 2017 WL 1960408, at *1 (May 11, 2017) (considering aggregate facts to conclude probable cause existed for seizure). "The government must show that it had reasonable grounds to believe a connection existed between the property and drug activities, supported by more than mere suspicion but less than prima facie proof." *Currency, U.S. $42,500.00*, 283 F.3d at 980.

Fourth Amendment privacy interests are "not implicated when only the external features of a package, like the address label are examined [because] there is no reasonable expectation that the outside of a package given to a mail-carrier will be kept private." *Hoang*, 566 F.3d at 1159-60; *Jefferson*, 566 F.3d at 933; *Hernandez*, 313 F.3d at 1209-10. Similarly, "the Fourth Amendment is not implicated by the use of a dog sniff by a trained dog to detect contraband in a package." *Hoang*, 566 F.3d at 1160; *Jefferson*, 566 F.3d at 933.

///

///

## II. Probable Cause to Search and Seize the Package

This Court concludes that Claimant's Fourth Amendment rights were not implicated by the visual inspection of the package, its brief placement in a deployment line, and the use of a dog sniff which all occurred prior to the express delivery date of the package. Further, probable cause existed to seize the package on April 24, 2015, based on the aggregated facts known to Inspector Soennecken and Officer Havice at that time, including the positive dog alert, the exterior characteristics of the package considered to be suspicious by Postal Inspector Soennecken (based on his experience and training), and the fact that the phone number associated with Claimant had a voicemail message permitting the caller to leave a message for "420 Farms." *See Hoang*, 566 F.3d at 1160, n.1 (holding that dog alert provided probable cause to seize package); *Florida v. Harris*, 133 S.Ct. 1050, 1057 (2013) ("If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search.").

Claimant has proffered no evidence disputing the reliability of the dog or the drug alert at issue in this proceeding. *See Harris*, 133 S.Ct. at 1058 (opining that a defendant may challenge dog alert on these grounds). In this regard, the Court rejects Claimant's assertion that the dog alert is of "no consequence" because it "occurred on what turned out to be a 'currency only' package." *See* Claimant's Mem. in Supp. of Mot. to Suppress at 10-11. The relevant inquiry is "whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Harris*, 133 S.Ct. at 1058. The fact that, when the package was searched, the officers discovered currency rather than drugs is of no consequence to the existence of probable cause to seize and open the package.

Courts "do not evaluate probable cause in hindsight, based on what a search does or does not turn up." *Id.* at 1059.

Further, this Court rejects Claimant's assertion that there was no probable cause to seize the package because it lacked any of the suspicious "cues" specifically outlined in paragraphs eight and nine of Soennecken's Declaration in support of the Complaint. *See* Claimant's Mem. in Supp. of Mot. to Suppress at 14-15.[1] The fact that Soennecken identified factors supporting the seizure of the package, which differed from the general indicators of drug trafficking summarized in two paragraphs of his Declaration, is irrelevant to the probable cause inquiry.

With regard to Claimant's consent to search the package, this Court notes that Claimant offers no argument or evidence to support the conclusion that, based on the totality of the circumstances, his consent to search the package was involuntary. *See United States v. Basher*, 629 F.3d 1161, 1168 (9th Cir. 2011) (listing five factors used to determine voluntariness of consent to warrantless search).

Finally, this Court rejects Petitioner's assertion that the seizure of the package after it was opened violated the Fourth Amendment for lack of probable cause. On the contrary, the following facts, known to the officers at the time of the seizure, provided probable cause to believe there was a connection between the currency and illegal drug activities: (1) the positive dog alert, (2) the package had exterior characteristics considered to be suspicious by an experienced postal inspector; (3) Claimant's acknowledgment that his property was called "420 Farms;" (4) the presence of a large greenhouse on Claimant's property which appeared to have a heating and ventilation unit attached

---

[1] In paragraphs eight and nine of his Declaration, Soennecken states that he knows from training and experience that drug traffickers often use false or incomplete information in labeling their parcels, and wrap the parcels and their content in a manner to disguise their odor. Compl., Ex. A at ¶¶ 8, 9.

to it; (5) Claimant's statement that he grows medical marijuana for ten patients and was soon to be growing for eighteen patients; (6) the seized package contained a cardboard box wrapped around a shoe box which contained a paper bag which had in it five groupings of money marked as $5,000, $5,000, $5,000, $5,600 and $2,000; and (7) Claimant's explanation that the money was for an investment in a coconut water deal but was unable to explain why an investor would send cash rather than a check. The existence of probable cause was not defeated by the fact that the officers could not definitively determine whether *all* of the currency seized had an odor of a controlled substance, or that the sender is the one who placed the odor on the currency. Finally, this Court rejects Claimant's assertion that "spoilation" of the evidence, i.e., depositing the currency into a bank, undermines this Court's finding of probable cause.

## CONCLUSION

Based on the foregoing, Claimant's Motion to Suppress (ECF No. 10) is DENIED.

IT IS SO ORDERED.

DATED this _18_ day of May, 2017.

Malcolm F. Marsh
United States District Judge